## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**JOSHUA M. FEATHERSTON**                                    **PLAINTIFF**
**ADC #154947**

**v.**                    **No: 4:21-cv-00956 BRW-PSH**

**JAMES DYCUS**, *et al.*                                    **DEFENDANTS**

## PROPOSED FINDINGS AND RECOMMENDATION

### INSTRUCTIONS

The following Recommendation has been sent to United States District Judge Billy Roy Wilson.   You may file written objections to all or part of this Recommendation.  If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

### DISPOSITION

### I.  Introduction

Plaintiff Joshua M. Featherston filed a *pro se* complaint on October 20, 2021, while incarcerated at the Arkansas Division of Correction's (ADC) Wrightsville

Unit.[1]    Featherston alleges that defendants Deputy Warden James Dycus and Lieutenant Floyd McHan (the "Defendants") solicited information from him about drugs coming into the prison and agreed to protect him from attacks by other inmates.  He further claims the Defendants were unhappy with the information he provided and retaliated against him by having him placed in an unsafe barracks where he was attacked by other inmates on February 10, 2021.

Before the Court is a motion for summary judgment and statement of facts filed by Featherston,[2] a response filed by the Defendants,[3] and a reply and notice filed by Featherston.[4]  The Defendants also filed a motion for summary judgment, brief-in-support, and statement of facts.[5]  Featherston filed a response, a declaration,

---

[1] Doc. No. 2.  Featherston is currently incarcerated in the ADC's East Arkansas Regional Unit.  *See* Doc. No. 155.

[2] Doc. Nos. 99 & 107-1.  Featherston's statement of facts was filed after the Defendants filed a response pointing out that Featherston had failed to file a separate statement of facts.

[3] Doc. No. 105.

[4] Doc. Nos. 111 & 124.  Featherston asserts that the Defendants' response to his motion for summary judgment is procedurally defective because it does not comply with Federal Rule of Civil Procedure 10(b) and should therefore be rejected.  Doc. No. 124. Featherston is mistaken; Rule 10(b) states that *claims* and *defenses* must be set forth in numbered paragraphs, not responses to motions.

[5] Doc. Nos. 102-104.

and additional evidence.[6]  Defendants filed a response to Featherston's statement of facts and a reply.[7]  For the reasons set forth in this Recommendation, the undersigned recommends that Featherston's motion for summary judgment be denied and the Defendants' motion for summary judgment be granted.

## II.  Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law."[8]  When ruling on a motion for summary judgment, the court must view the evidence in a light most

---

[6] Doc. Nos. 108-109 & 117-119.  Although Featherston responds to some of the Defendants' asserted facts in his declaration (which he asks to be considered part of his statement of disputed facts), he did not file a separate statement setting forth disputed facts he believes must be decided at trial as required by Local Rule 56.1.  Instead, he filed a one-page "Statement of Undisputed Material Facts" referring to his declaration.  Doc. No. 110.  Featherston later moved to correct the title to "Statement of Disputed Facts."  Doc. No. 116.  Because Featherston failed to file a separate statement disputing the facts asserted by Defendants, the Defendants' statement of facts is deemed admitted pursuant to Local Rule 56.1(c).  Nevertheless, the Court describes those facts disputed by Featherston in its discussion of relevant facts.

[7] Doc. Nos. 113-114.  Defendants' response to Featherston's statement of facts refers to both his statement of facts in support of his motion for summary judgment (Doc. No. 107-1) and his statement of facts in response to their motion for summary judgment (Doc. No. 110).  Featherston filed a response to the Defendants' reply asserting that is procedurally deficient under Fed. R. Civ. P. 10(b).  Again, Featherston is mistaken.  *See* n. 4, *supra.*

[8] Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986).

favorable to the nonmoving party.[9]   The nonmoving party may not rely on allegations or denials, and must instead demonstrate the existence of specific facts that create a genuine issue for trial.[10]   The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy.[11]

An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . .".[12]   A party may also show that a fact is disputed or undisputed by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[13]   A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome

---

[9] *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002).

[10] *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007).

[11] *Id.* (citations omitted).

[12] Fed. R. Civ. P. 56(c)(1)(A).

[13] Fed. R. Civ. P. 56(c)(1)(B).

of the case.[14]   Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment.[15]

In *Reed v. City of St. Charles, Mo.*,[16] the Eighth Circuit Court of Appeals discussed the requirement that facts be viewed in the light most favorable to the nonmoving party when considering a motion for summary judgment.  The Court stated, "[i]f 'opposing parties tell two different stories,' the court must review the record, determine which facts are material and genuinely disputed, and then view those facts in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them."[17]

### III.  Facts[18]

During the months relevant to this lawsuit – December 2, 2020 until February 10, 2021 – Featherston was housed at the ADC's Wrightsville Unit.[19]  Defendants

---

[14] *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012).

[15] *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

[16] 561 F.3d 788 (8th Cir. 2009).

[17] *Id.* at 790 (*quoting Scott v. Harris*, 550 U.S. 372, 380 (2007)).

[18] Unless otherwise noted, these material facts are taken from the parties' statements of facts (Doc. Nos. 104 & 107-1) and the exhibits provided by the parties, including Featherston's deposition testimony.  Disputed facts are noted.  Opinions, legal conclusions, and immaterial facts are omitted.

[19] *Complaint* (Doc. No. 2); *Declaration of DeAngelo Earl* ("*Earl Declaration*") (Doc. No. 102-2) at ¶ 44.  Earl is not a party to this lawsuit but currently serves as warden

Warden Dycus and Lieutenant McHan worked at the Wrightsville Unit during the that time.[20]

In December 2020, Featherston, a Class IV inmate, resided in 12 barracks.[21] On December 2, 2020, he was attacked by inmates there.[22] Non-party Officer Karla Clark conducted the investigation of this incident, including interviewing Featherston as to who attacked him.[23] According to Clark, Featherston identified five inmates: W.T., S.B., C.P, J.S., and R.C.[24] Each of the five attacking inmates was charged with a disciplinary[25] and placed on Featherston's enemy alert list

---

of the Wrightsville Unit; he states in his declaration that he reviewed Featherston's institutional file before making his declaration. *Earl Declaration* at ¶¶1-4 & 43.

[20] *Declaration of James Dycus* (Doc. No. 102-7) at ¶ 5; *Declaration of Floyd McHan* (Doc. No. 102-8) at ¶ 4.

[21] *Earl Declaration* at ¶¶44-45; *Bed Assignments* (Doc. No. 102-3); *Deposition Testimony of Joshua Featherston* ("*Featherston Deposition*") at 22:14-19. (Page numbers refer to the deposition page numbers, not the document's page numbers on the Court's ECF filing system.)

[22] *Featherston Deposition* at 22:20-22-23:2; *December 2, 2020 Incident Report* (Doc. No. 102-5).

[23] *Earl Declaration* at ¶47; *December 2, 2020 Incident Report*; *Declaration of Karla Clark* ("*Clark Declaration*") at ¶8.

[24] *Earl Declaration* at ¶48; *December 2, 2020 Incident Report*; *Clark Declaration* at ¶9.

[25] Featherston asserts in his declaration in response to the Defendants' motion for summary judgment that Clark wrote no disciplinaries in response to the December 2020 attack and did not put any inmates on his enemy alert list. Doc. No. 109 at 16-17. He refers to exhibit #3, which appears to be an earlier version of Clark's incident report dated December 3, 2020.

according to Earl and Dycus.[26]  Featherston disputes that these inmates were placed on his enemy alert list.[27]  Immediately after this, Featherston was transferred to a single man cell.[28]  Featherston maintains inmate M.M. also attacked him on December 2, and he verbally reported this to Clark at the time.[29]

Clark's incident report, dated December 22, 2020, states:

> On 12-02-20 at 1:50 pm I, LT. Karla Clark was returning an inmate to 11 barracks when 11/12 barracks officer (Kiera Crutchfield) informed me that there was an inmate in 12 barracks that was saying that he need out of 12 barracks now.  I went to 12 barracks and inmate Featherston, Joshua #154947 was in 12 barracks with most of his property packed up and waiting to exit 12 barracks.  Inmate Featherston had visible abrasions on his face.  I took inmate Featherston outside and questioned him about the abrasions and he informed that he had been jumped by 5 inmates.  I took inmate Featherston to the infirmary to be seen by medical and for a pre-lock up.  Urinalysis was conducted with negative results.  Photos were taken of inmate Featherstons visible abrasions on his face, head, arms, back chest and legs.  Inmate Featherston was seen by medical, and placed in restrictive housing (0012) pending an investigation.  Inmate Featherston stated that inmates [T.W., S.B., C.P., J.S., and R.C.] had jumped on him kicking him over an over.  Each of

---

[26] *Earl Declaration* at ¶49; *December 2, 2020 Incident Report*; *Dycus Declaration* at ¶8.  Earl also explains in his Declaration that the ADC has an Enemy Alert System. *Earl Declaration* at ¶¶7-22.  The system "tracks an inmate's known enemies or physical aggressors and prevents inmates with violent or potentially violent conflicts from being housed together." *Id.* at ¶¶ 8; *see also AD 13-49, Enemy Alert System* (Doc. No. 102-1). The policy requires that an inmate identify any individual who he believes is an enemy. *Id.* at ¶¶12-14.  Those allegations are investigated and if found credible, the inmate is placed on the threatened inmate's enemy alert list.  *Id.* at ¶¶21-22.

[27] Doc. No. 109 at 20-21.

[28] *Earl Declaration* at ¶50; *Bed Assignments*; *December 2, 2020 Incident Report*; *Dycus Declaration* at ¶9.

[29] *Featherston Deposition* at 27:12-16.

these inmates were interviewed and witness statements taken stating that they have no knowledge of this incident.  Although there are visual and obvious abrasions to inmate Featherston there is no evidence of who attacked him other than his statement.  Inmate Featherston was kept in restrictive housing for his safety.  I, Lt. Karla Clark charge inmates [T.W., S.B., C.P., J.S., and R.C.] with rule violations 04-8, 5-5, and 12-3 pending disciplinary court review.  This concludes my investigation on this matter.[30]

Clark's report does not identify inmate M.M. as one of the attackers.

Featherston alleges that he provided Dycus and McHan with information about how drugs were getting into the prison on December 2 and 3, 2020, in exchange for protection.[31]  Featherston claims this information led to an ADC's employee's termination.[32]  Defendants deny promising Featherston anything in exchange for information about contraband.[33]

---

[30] *Unredacted December 2, 2020 Incident Report* (Doc. No. 75 at 3).  All quotations are transcribed verbatim without any corrections for misspellings or mistakes.

[31] *Complaint* at 5; *Featherston Deposition* at 20:9-25-22:13, 30:18-31:13. Featherston states on page 30 of his deposition that this conversation took place on February 11, 2021, the day after the second attack in 12 barracks.  Reading the full context of the deposition, it seems he misspoke and meant to say this took place the day after the attack in December 2020.

[32] *Featherston Deposition* at 31:3-13

[33] *Dycus Declaration* at ¶12; *McHan Declaration* at ¶18.

Two weeks later, Featherston was reintegrated into population.[34]  At this time, Featherston was still Class IV and was assigned to hoe squad for work.[35] Featherston was assigned to 2 barracks by the Unit Classification Officers where he resided until February 3, 2021.[36]  On February 3, 2021, Officer Diane Lindsey issued a movement order for Featherston to 12 barracks based on his class and job assignment during her daily unit re-alignment process.[37]  Defendants maintain they took no part in the unit re-alignment process or had any role in determining to re-

---

[34] *Bed Assignments*.

[35] *Earl Declaration* at ¶52.

[36] *Bed Assignments; Earl Declaration* at ¶51.

[37] *Earl Declaration* at ¶53; *Dycus Declaration* at ¶13; *McHan Declaration* at ¶6. In his declaration, Earl explained that the Wrightsville has four single man cells reserved for inmates assigned to Behavior Control, those in need of treatment observation, or inmates who have been involved in an altercation pending an investigation. *Earl Declaration* at ¶¶23-24.  Once an investigation is complete, inmates who have been involved in an altercation are moved back to general population because it better prepares them for reintegration into society. *Id.* at ¶¶25-26.  Earl explained that inmates are typically assigned to a barracks in general population based on their class, job assignment, program enrollment, gang affiliations, or enemy alerts. *Id.* at ¶¶27-29. Although inmates should generally be housed with other inmates of the same class, space and other considerations do not always allow for that and inmates are moved around as needed by the unit classification officer. *Id.* at ¶¶34-39.  The unit classification officer conducts a daily review of all inmate status changes, new inmate intakes, inmates being released from restrictive housing, inmate transfers or releases, and new job assignments. *Id.* at ¶40.  That officer then generates a daily report known as the movement sheet, which moves inmates to the most appropriate barracks available to keep the unit in order. *Id.* at ¶41.  In February 2021, that officer was Diane Lindsay.  *Id.* at ¶42.

assign Featherston.[38]   A movement assignment sheet was posted in 2 barracks, notifying Featherston he was being relocated to 12 barracks.[39]

After receiving his movement notification, Featherston refused to move, and the control booth officer called for back-up.[40]  McHan and non-party Officer Boyd reported to 2 barracks to talk with Featherston.[41]  Featherston claims he told McHan that being moved into 12 barracks placed him in danger and he tried to submit an emergency grievance to that effect, but McHan refused to take it.[42]  Featherston did not provide McHan with the specific name or description of any inmate in 12 barracks he believed would harm him.[43]  Instead, Featherston claimed to be in danger from every inmate living in 12 barracks.[44]  At the time Featherston made this statement to McHan, Featherston was unaware which inmates lived in 12 barracks.[45]

---

[38] *Dycus Declaration* at ¶14; *McHan Declaration* at ¶7.

[39] *Featherston Deposition* at 31:19-21.

[40] *Id.* at 31:21-23; *McHan Declaration* at ¶8.

[41] *Featherston Deposition* at 31:24-25; *McHan Declaration* at ¶9.

[42] *Featherston Deposition* at 31:24-25 – 32:1-6.

[43] *Id.* at 38:9-17; *McHan Declaration* at ¶16.

[44] *Featherston Deposition* at 38:9-17.

[45] *Id.* at 38:15-24.

Specifically, he did not know that inmate M.M. lived there.[46]  Because Featherston did not provide McHan with any credible information to investigate, McHan ordered Featherston to move to 12 barracks as directed.[47]  This was the only conversation between Featherston and McHan about 12 barracks in February 2021.[48]

According to Featherston, soon after he arrived in 12 barracks the other inmates in 12 barracks had a meeting about him because some inmates believed he was a snitch.[49]  No harm came to Featherston as a result of this meeting, and other inmates told Featherston he was fine as long as nothing else suspicious occurred in the barracks.[50]  Featherston testified that after conversations with fellow inmates "Insane Rob" and "TK" on February 4, 2021, he was under the impression he was "going to be okay."[51]  Featherston did not report this barracks-wide meeting to any ADC official.[52]  Featherston did not encounter any other problems in 12 barracks from February 3 until February 10, 2021, except for a handful of inmates telling him

---

[46] *Id.*

[47] *McHan Declaration* at ¶17.

[48] *Id.* at ¶19; *Featherston Deposition* at 41:3-5.

[49] *Featherston Deposition* at 36:14-24.

[50] *Id.* at 14-24, 43:7 – 44:23.

[51] *Id.* at 44:11-16.

[52] *Id.* at 39:6-17, 39:25-41:8.

that they believed he snitched to Dycus about drugs and were watching him.[53]  He stated, "[i]f anything suspect happened, they were going to basically beat the hell out of me."[54]

On February 10, 2021, inmates M.M., D.D., and J.V. attacked Featherston in 12 barracks.[55]  Featherston described the attack as a complete surprise.[56]  The February 10, 2021, attack did not involve any of the five inmates who were listed as Featherston's attackers in December 2020.[57]  All five inmates reported to have been involved in the December 2020 attack were living in other barracks or units on February 10, 2021.[58]

When questioned about the three inmates who attacked him in 12 barracks on February 10, 2021, Featherston acknowledged he never had any negative interactions with inmates D.D. or J.V. in the past, and neither inmate threatened him

---

[53] *Id.* at 41:9-18; 44:20-23; 46:12-15.

[54] *Id.* at 41:17-18.

[55] *Earl Declaration* at ¶54; *February 10, 2021 Incident Report* (Doc. No. 102-6). There is no dispute that Featherston was attacked on this date or that he suffered injuries.

[56] *Featherston Deposition* at 25:15-22, 44:25 – 45:1-6.  Featherston later claimed that he was surprised because the inmates led him to believe he was safe to trick him into letting his guard down before the attack.  *See* Doc. No. 139.

[57] *Earl Declaration* at ¶59; *December 2, 2020 Incident Report* (listing attackers)*; February 10, 2021 Incident Report* (listing attackers)*; Dycus Declaration* at ¶18. Unredacted versions of these incident reports were filed under seal at Doc. No. 75.

[58] *Earl Declaration* at ¶60; *Dycus Declaration* at ¶17.

after he moved back into 12 barracks on February 3, 2021.[59]   According to Featherston, M.M. never threatened him once he was moved back into 12 barracks, but Featherston claims that inmate M.M. was involved in the December 2020 attack on him.[60]   Featherston never sought to add M.M. to his enemy alert list after being moved back into 12 barracks,[61] nor did Featherston alert any officers, including Dycus or McHan, about any concerns with M.M. after being moved back into 12 barracks.[62]

Featherston never alerted any ADC staff member, including Defendants, that he was having issues while housed in 12 barracks, or that any inmates in 12 barracks were threatening or otherwise harassing him after being moved into 12 barracks and before being attacked on February 10, 2021.[63]   Featherston did not submit any inmate request or interview forms to any ADC officers, including Dycus and

---

[59] *Featherston Deposition* at 47:8-19, 45:20-46:7.

[60] *Id.* at 45:20-22, 23:17-25.  Again, Clark maintains that Featherston did not provide M.M.'s name to her during the investigation in December 2020 (*Clark Declaration* at ¶¶9-12), while Featherston testified he did (*Featherston Deposition* at 27:12-16).

[61] *Earl Declaration* at ¶55; *Dycus Declaration* at ¶16.

[62] *Featherston Deposition* at 37:12-25-38:1-17, 38:25-39:1-9.

[63] *Id.* at 37:15-41:8. *See also Dycus Declaration* at ¶ 15; *McHan Declaration* at ¶¶ 19-20.

McHan, between February 3 and February 10, 2021.[64]   Featherston had no conversations with either Dycus or McHan after being moved into 12 barracks on February 3, 2021, and prior to his attack on February 10, 2021.[65]  Featherston claims that he was under the supervision of the inmates in 12 barracks once placed there and indicates that he could not file any requests or grievances because he feared them.[66]

Additionally, Featherston did not write any grievances about being re-assigned to 12 barracks on February 3, 2021.[67]  Featherston claims to have written an emergency grievance while still residing in 2 barracks, but after McHan refused to accept it, he did not attempt to proceed further in the grievance process.[68]  Featherston has never produced a copy of this emergency grievance, despite being asked for it during discovery, but concedes that such a grievance did not identify any specific inmate in 12 barracks he believed would harm him.[69]

---

[64] *Id.* at 39:6-9, 39:25-40:3.  *See also Earl Declaration* at ¶56; *Dycus Declaration* at ¶ 19; *McHan Declaration* at ¶ 20.

[65] *Id.* at 41:3-8.  *See also Dycus Declaration* at ¶ 15; *McHan Declaration* at ¶ 19.

[66] *Id.* at 32:20-25; 39:11-14.  *Featherston's Declaration* (Doc. No. 109) at 10-11.

[67] *Id.* at 38:25-39:5; *Earl Declaration* at ¶ 57.

[68] *Id.* at 32:14-33:16.

[69] *Id.* at 38:2-17.

On February 10, 2021, Featherston submitted a grievance concerning the attack.[70]  He stated:

> On 2-10-21 I was stomped out a second time in 12 barracks after the first time Lt. Mchan and DW Dycus made a deal with me saying that if I gave them a officer bringing in drugs to which I did and I gave them all other ways drugs are brought in that DW Dycus would give me my class and not put me back in danger. they lied to me and made me move back to 12 barracks after I told on them.  Deliberately putting me in danger again and getting me stomped out again and they did not give me my class.  They talked me into snitching and then gave me to the inmates that I told on.[71]

The warden's response stated:

> According to Deputy Warden Dycus, no fruitful information was received from you and besides, you keep getting into trouble and violating policy.

> Regarding your complaint that you were placed back in Barrack #12, the same building that you have been attacked, our records show that you are not in Barrack #12 (Zone 4) but Barrack #1 (Zone 1).[72]

> And finally, concerning the issue you raised about your class, be advised that inmates are promoted based on favorable institutional record (i.e., without disciplinary infraction).

> Thus, I find your grievance without merit.[73]

---

[70] *Grievance WR-21-00041* (Doc. No. 99 at 14).

[71] *Id.*

[72] Although the response states that Featherston was in 1 barracks, it is undisputed that he was moved to 12 barracks and was housed there at the time of the February attack. Perhaps Featherston was moved to 1 barracks after the attack and was there at the time of the response.

[73] *Id.*

Featherston appealed, stating that he had in fact given Dycus information about Corporal Jordan on December 2, 2020, and Lieutenant McHan told him on December 3, 2020, that Jordan had been confronted about bringing drugs into the prison and was no longer working there.[74]   Featherston further alleged that he was then moved back into 12 barracks where he was beaten because he had reported Jordan.[75]

## IV.  Analysis

### A.    Featherston's Motion for Summary Judgment

Featherston's motion for summary judgment should be denied because it is unsupported by any evidence to prove his allegations.  As plaintiff, Featherston bears the burden of proof.  However, his motion simply restates the allegations of his complaint and offers no evidence to prove his claims against the Defendants.  The grievance he submits as proof that Defendants agreed to protect him in exchange for information does not prove that point.  The response merely states that he did not provide valuable information.  It does not serve to prove that the Defendants

---

[74] *Id.*

[75] *Id.* Featherston also includes evidence that on February 11, 2021, he called the state police hotline to report his allegations that the Defendants placed him in 12 barracks in retaliation for not having received good information from him.  This evidence is not relevant to his claims against the Defendants in this case – it does not show that they intentionally placed him in 12 barracks to place him in danger – it merely shows that he believes they did.

promised not to move him into 12 barracks again, or to protect him in exchange for providing information.  It also does not show that the Defendants intentionally placed him back in 12 barracks before the second attack or had any reason to believe he would be attacked there.  The other evidence offered by Featherston merely serves to prove facts that are undisputed by the Defendants – that he was attacked in December 2020 and February 2021 and that he suffered or at least complained of injuries after those attacks.[76]  Featherston also submitted four affidavits from other inmates but only one is arguably relevant:  the affidavit of Denver Powell.[77]  Powell states that he witnessed the attack on Featherston in 12 barracks on February 10, 2021, and that he believed guards, including the Defendants, set Featherston up for writing grievances.[78]  However, Powell's belief, unsupported by any other evidence, does not serve to prove Featherston's claim that the Defendants intentionally placed

---

[76] *See* Doc. No. 99 at 16-39.

[77] *Affidavit of Denver Powell* (Doc. No. 99 at 42).  Eddie Buchy provided an affidavit stating that he was once asked for information by Defendant Dycus and had prior issues with non-defendant Lieutenant McDaniels.  Doc. No. 99 at 44.  Lawrence Morris provided an affidavit stating that he was in 7 barracks with Featherston at the Grimes Unit when Featherston was jumped on; he states that other inmates told him they did because Featherston snitched at the Wrightsville Unit.  *Id.* at 46.  Donald Steele provided an affidavit stating that Featherston got beat up badly and he brought him food so he could eat.  *Id.* at 48.  Steele does not describe the date or place of this attack, but Featherston indicates it was the attack at the Grimes Unit.

[78] *Id.*

in 12 barracks so that he would be attacked.  For these reasons, Featherston's motion for summary judgment should be DENIED.

## B.   **The Defendants' Motion for Summary Judgment**

### 1.   *Sovereign Immunity*

Featherston's claims against the Defendants in their official capacities are barred by sovereign immunity.  A suit against a state employee in his or her official capacity is in essence a suit against the State of Arkansas, and any official capacity claim for monetary damages against that defendant is barred by the doctrine of sovereign immunity.[79]  Accordingly, Featherston's official capacity claims for money damages[80] should be dismissed.

### 2.   *Qualified Immunity*

The Defendants argue that they are entitled to qualified immunity because Featherston cannot establish that they violated his clearly established constitutional rights.  Qualified immunity protects government officials from liability for damages "insofar as their conduct does not violate clearly established statutory or

---

[79] *Will v. Michigan Department of State Police, et al.*, 491 U.S. 58, 71 (1989)*; Nix v. Norman*, 879 F.2d 429, 431-432 (8th Cir. 1989).

[80] Featherston does not seek injunctive relief (other than release from prison). Doc. No. 2 at 4.  Release from prison is not a remedy this Court can provide in a § 1983 case.  *See Preiser v. Rodriguez*, 411 U.S. 475, 484, 499 (1973) (If release from confinement is sought, the appropriate action is a federal habeas petition, pursuant to 28 U.S.C. § 2254, once the prisoner has exhausted his available remedies in state court.).

constitutional rights of which a reasonable person [in their positions] would have known."[81] Qualified immunity is a question of law and is appropriately resolved on summary judgment.[82]   To determine whether a defendant is entitled to qualified immunity, the Court must consider two questions: (1) do the facts alleged by plaintiff establish a violation of a constitutional or statutory right; and (2) if so, was that right clearly established at the time of the defendant's alleged misconduct.[83]   Courts may exercise "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[84]

### Eighth Amendment Failure-to-Protect Claim

An inmate has a constitutional right to be free from attacks by other inmates.[85] A correctional officer is liable for failing to protect an inmate if the inmate can make the following two-part showing:

> A correctional official "violates the Eighth Amendment if he is deliberately indifferent to the need to protect an inmate from a substantial risk of serious harm from other inmates." *Jackson v. Everett*, 140 F.3d 1149, 1151 (8th Cir. 1998).  "A failure-to-protect

---

[81] *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).

[82] *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

[83] *Wright v. United States*, 813 F.3d 689, 695 (8th Cir. 2015).

[84] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[85] *See Robinson v. Cavanaugh*, 20 F.3d 892 (8th Cir. 1994).

claim has an objective component, whether there was a substantial risk of harm to the inmate, and a subjective component, whether the prison official was deliberately indifferent to that risk." *Curry v. Crist*, 226 F.3d 974, 977 (8th Cir. 2000).  To be liable, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994). . . .[86]

The Eighth Circuit Court of Appeals has recognized that prison officials are entitled to qualified immunity when an inmate is attacked by surprise.[87]  For the reasons stated below, Featherston has failed to establish that the Defendants violated his constitutional right to be free from attacks by other inmates, and therefore Defendants are entitled to qualified immunity and judgment as a matter of law.

The undisputed facts in this case provide no evidence that Defendants acted with deliberate indifference to a substantial risk of serious harm to Featherston. Those facts include:

- Featherston was attacked in 12 barracks in December 2020 and on February 10, 2021.

- None of the five inmates who were listed as attacking Featherston in December 2020 were housed in 12 barracks in February 2021.

---

[86] *Jones v. Wallace*, 641 Fed. Appx. 665, 666 (8th Cir. 2016).

[87] *See Schoelch v. Mitchell*, 625 F.3d 1041 (8th Cir. 2010); *Tucker v. Evans*, 276 F.3d 999, 1001 (8th Cir. 2002).

- None of those five inmates in fact attacked Featherston in February 2021.

- Featherston objected to being moved into 12 barracks on February 3, 2021 but did not list or report any specific inmate whom he feared there; rather, he indicated he was afraid of *every* inmate in 12 barracks.

- Featherston did not know which inmates lived in 12 barracks in February 2021 and did not know that M.M. (an inmate who allegedly attacked him in December 2020) lived there.

- Featherston was not threatened by M.M. in February 2021, did not seek to add M.M. to his enemy alert list, and did not otherwise alert Defendants or any other ADC official of any problems he had in 12 barracks between February 3 and February 10, 2021.

- Featherston did not write any requests or grievances regarding his safety while housed in 12 barracks between February 3 and February 10, 2021, the date he was attacked.

These undisputed facts show that Defendants were not made aware of a substantial risk of serious harm to Featherston in 12 barracks in February 2021. There is in fact no evidence that Dycus was made aware of Featherston's objections to moving back to 12 barracks, and Featherston only expressed a general fear to McHan before he was moved back to 12 barracks, which is insufficient to show deliberate indifference

on McHan's part.[88]  There is also no evidence that the Defendants were responsible for placing Featherston in 12 barracks in February 2021.

There are two essentially factual disputes in this case, but neither are material. First, even if the Court assumes that Featherston had an agreement with the Defendants to provide information in exchange for his protection, there is no evidence to support Featherston's belief that these Defendants intentionally placed him in 12 barracks in February 2021, knowing that he faced a substantial risk of harm there.  Again, the undisputed facts outlined above do not show that Defendants were responsible for assigning Featherston to 12 barracks or that they were ever put on notice that he faced any particular danger there.  Additionally, Featherston has not specifically described the information he allegedly gave Defendants that caused him to be in danger in 12 barracks – he does not name or describe any inmates there who were impacted by the information he provided.  In his grievance, he stated that the Defendants "gave" him to the inmates he "told on";[89] in his appeal, he claimed that his information led to a guard being fired; and in his deposition, he testified that

---

[88] *See e.g., Robinson v. Cavanaugh,* 20 F.3d at 895 (An inmate's complaints regarding a "general fear for his safety" do not establish that a defendant "acted with deliberate indifference by not placing him in protective custody."); *Jones v. Wallace*, 641 Fed. Appx. 665 (8th Cir. 2016) (unpublished) (a general fear of another inmate is not sufficient to put guards on notice of a specific threat or danger).

[89] *See Grievance WR-21-00041* ("They talked me into snitching and then gave me to the inmates that I told on.").

all the inmates in 12 barracks were upset with him because he had stopped drugs coming into that barracks.[90]  Featherston does not specifically allege why he faced danger in 12 barracks when he was moved there in February 2021, and he cannot show that the Defendants were aware of some specific danger.

The second disputed fact concerns whether Featherston reported M.M. to Clark after the first attack, and whether she failed to place M.M. on Featherston's enemy alert list.  This fact, even if true, is not material because there is no evidence that *the Defendants* were aware of Featherston's allegation that M.M. previously attacked him or that they had any role in assigning Featherston to 12 barracks in February 2021.

In sum, Defendants are entitled to qualified immunity on Featherston's failure-to-protect claim because the undisputed material facts show there was no constitutional violation.

### **First Amendment Retaliation Claim**

To succeed on a § 1983 retaliation claim, a plaintiff must prove: (1) that he engaged in a protected activity; (2) that the government official took adverse action against him that would chill a person of ordinary firmness from continuing the

---

[90] *See Featherston Deposition* at 34:18-23 ("I never said [M.M.] put a hit on me.  I said I had a hit put out on me.  [M.M.] is not the guy that was getting all the drugs in.  He was just benefiting from it, getting to get high and stay high.  He's one of the guys one of the dope guys gave drugs to to do this.").

activity; and (3) that the adverse action was motivated at least in part by the exercise of the protected activity.[91]  Speculative and conclusory, or *de minimis* allegations cannot support a retaliation claim.[92]  A plaintiff must also prove a causal connection between the constitutionally protected activity and the adverse action.[93]  Temporal proximity between a protected activity and an adverse action "is relevant but not dispositive."[94]  To succeed on a retaliation claim, a plaintiff must also provide affirmative evidence of a retaliatory motive.[95]

In his response to the Defendants' motion for summary judgment, Featherston makes clear that he does not claim Defendants retaliated against him based on prior lawsuits he filed.[96]  Instead, he asserts that they retaliated against him because they

---

[91] *Gonzalez v. Bendt*, 971 F.3d 742, 745 (8th Cir. 2020); *Spencer v. Jackson Cnty.*, 738 F.3d 907, 911 (8th Cir. 2013).

[92] *See Atkinson v. Bohn*, 91 F.3d 1127, 1129 (8th Cir. 1996) (per curiam).

[93] *Revels v. Vincenz,* 382 F.3d 870, 876 (8th Cir. 2004).

[94] *Wilson v. Northcutt*, 441 F.3d 586, 592 (8th Cir. 2006) (citing *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1136 (8th Cir. 1999)).

[95] *See Haynes v. Stephenson,* 588 F.3d 1152, 1157 (8th Cir. 2009); *see also Wilson*, 441 F.3d at 592 ("[Plaintiff's] belief that [defendant] acted from a retaliatory motive is insufficient.").

[96] *See* Doc. No. 109 at 12.  Prior to February 3, 2021, Featherston filed two other lawsuits against the ADC or ADC employees: *Featherston v. Ball, et al.*, 4:20-CV-989-KGB-PSH and *Featherston v. Lewis*, 4:21-CV-11-BSM-BD.  Neither Dycus nor McHan was a defendant in either lawsuit.  In his response, Featherston states, " . . . these two lawsuits are not in any way related to this case, . . .".  Doc. No. 109 at 12.

did not like the information he provided after the December 2020 attack.[97]  While it is not entirely clear that information given to prison officials regarding illegal activities is considered protected speech for First Amendment purposes, the Court will assume it is for purposes of this recommendation because Featherston's retaliation claim fails in any case.[98]

Featherston has come forward with nothing more than speculation and conjecture regarding the Defendants' motive to retaliate against him.  Again, he has not even described what specific information he gave the Defendants or explained why they were unhappy with it.  In the grievance he filed, he alleged the Defendants "gave" him to the inmates he told on, but in both his deposition and his grievance

---

[97] *See id.* ("So, again I must stress that my retaliation claim in this case is from the defendants violating law and my constitutional rights because I was not able to give them good enough information about drugs in prison.").

[98] Defendants assert that the Eighth Circuit Court of Appeals has never addressed whether inmates have a protected First Amendment right to voluntarily "snitch" on other inmates or guards but has only addressed inmates' right not to be labeled a snitch in prison (in the context of a failure-to-protect claim). *See* Doc. No. 103 at 33.  However, in applying qualified immunity, the Eighth Circuit Court of Appeals subscribes to "a broad view of the concept of clearly established law, and we look to all available decisional law, including decisions from other courts, federal and state, when there is no binding precedent in this circuit." *Turner v. Arkansas Ins. Dep't*, 297 F.3d 751, 755 (8th Cir. 2002); *Vaughn v. Ruoff*, 253 F.3d 1124, 1129 (8th Cir. 2001).  At least one court has determined that an inmate's decision not to snitch or serve as a prison informant is protected First Amendment speech. *See Burns v. Martuscello,* 890 F.3d 77, 93 (2d Cir. 2018).  It would seem to follow that an inmate's decision to voluntarily provide information is also protected speech.

appeal, he indicated that information he provided led to the termination of a guard.[99]

He also claims that the inmates in 12 barracks were unhappy with him because his

information stopped drugs coming to them.[100] That indicates he gave good

information to the Defendants that resulted in less drugs coming into the unit.

Featherston does not explain why Defendants would be motivated to retaliate against

him for providing this information, and he has come forward with no proof to support

his belief that they did.[101]

## V.   Conclusion

The undersigned recommends that Featherston's motion for summary

judgment (Doc. No. 99) be denied and the Defendants' motion for summary

judgment (Doc. No. 102) be granted.  Featherston's failure-to-protect and retaliation

claims should be dismissed with prejudice.  Defendants are entitled to sovereign

immunity on his official capacity claims and qualified immunity on his individual

capacity claims.

---

[99] *See Grievance WR-21-00041. See also Complaint* at 6 ("But D-W Dycus and Lt. Mchan lied to the plaintiff and threw the plaintiff to the inmates that he told on to get the plaintiff hurt.").

[100] *See Featherston Deposition* at 34:20-23 ("[M.M.] is not the guy that was getting all the drugs in.  He was just benefiting from it, getting to get high and stay high. He's one of the guys one of the dope guys gave drugs to to do this.").

[101] *See Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir.2005) ("A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor.").

DATED this 5th day of July, 2023.

_____
UNITED STATES MAGISTRATE JUDGE